UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ] ] |
| v. | ] Criminal No. 18-CR-327 ] Judge Amy Berman Jackson |
| LAWRENCE SCHMIDT | ] ] ] |

**SENTENCING MEMORANDUM**

Defendant Lawrence Schmidt, through undersigned counsel, respectfully submits the following memorandum in support of sentencing.

Mr. Schmidt pled guilty to one count of bank fraud.  21 USC § 1344(1).  For the reasons stated below, pursuant to 18 U.S.C § 3553(a), Mr. Schmidt submits that a variance below the U.S. Sentencing Guidelines (USSG) is warranted due to his early plea of guilty; his incarceration during the COVID pandemic, which create additional punitive conditions and unnecessary risk; actual money loss in this case which was much lower than the U.S. Sentencing Guidelines level loss; and his rehabilitation efforts and desire and ability to begin restitution payments.

Mr. Schmidt requests a sentence of 2 years (24 months) incarceration, with up to 5 years supervised release contingent on completion of restitution payments in this case.

1

### *I. Considerations in Imposition of Sentence*

The Federal sentencing statute, 18 U.S.C. § 3553(a), requires that this Court impose a sentence that is ". . . sufficient but not greater than necessary" to comply with the purposes of sentencing as set forth in 18 U.S.C. §3553(a).

In United States v. Booker, 543 U.S. 220 (2005), the U.S. Supreme Court held that the U.S. Sentencing Guidelines (USSG) are advisory only - not mandatory. In Rita v. United States, 551 U.S. 338,351 (2007), the Supreme Court further explained that "...the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines should apply." The court can no longer presume that a Guidelines sentence is the appropriate sentence. To do so would be to take a large step in the direction of returning to the pre-Booker regime. United States v. Pickett, 475 F.3d 1347 (D.C. Cir. 2007).

While this Court must still correctly calculate the guideline range, Gall v. United States, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, id. at 51; Nelson v. United States, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). Kimbrough v United States, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," id. at 49-50, and explain how the facts relate to the purposes of sentencing. Id. at 53-60; Pepper v. United States, 131 S. Ct. 1229, 124243 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." Id. at 101; Pepper, 131 S. Ct. at 1242-43.

A key component of Supreme Court law, designed to ensure that the guidelines are truly advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." Kimbrough, 552 U.S. at 101-02 (internal punctuation omitted)(citing Rita v. United

States, 551 U.S. 338, 351 (2007)(district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations"). As the Supreme Court held in Kimbrough, because "the cocaine Guidelines, like all other Guidelines, are advisory only," it "would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." Kimbrough, 552 U.S. at 91, 109-10; see also Spears v. United States, 555 U.S. 261, 267 (2009) ("[D]istrict courts are entitled to vary from the crack cocaine Guidelines in a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range.").

The factors under 18 U.S.C. section 3553(a) to be considered in imposing a sentence that is sufficient but not greater than necessary to comply with the purposes of section 3553(a) include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the advisory guidelines range;
>
> (5) any pertinent policy statements issued by the Sentencing Commission;
>
> (6) the need to avoid unwarranted sentence disparities; and
>
> (7) the need to provide restitution to any victims of the offense.

## II.  Sentencing Factors under 18 USC § 3553

**A.     *Summary of Factors Compelling Variance Below the Guidelines***

Given the factors detailed below, the USSG advisory guideline range is excessive for protection of the community or punishment:

- Mr. Schmidt has fully accepted responsibility at the earliest opportunity;
- the coronavirus pandemic creates punitive measures and unnecessary risks for incarcerated inmates which are solely due to the pandemic;
- actual financial loss in this case was substantially lower than the USSG Guidelines level loss as calculated; and
- Mr. Schmidt has made extensive efforts at rehabilitation, showing that upon release he is capable of starting restitution payments which benefit the community.

**B.     *Full and Early Acceptance of Responsibility***

Mr. Schmidt indicated his desire to plead guilty from the time of his initial appearance in this case.  He patiently waited while the pandemic and transfer of prosecutors delayed the case, while making it clear he still wanted to resolve the case.  This saved the government and the court resources, and the parties were able to focus on good faith efforts to resolve the case.

**C.     *Family History***

Mr. Schmidt moved regularly during his developmental years, rotating between his mother and grandmother.  He did not have a male role model in his life, and clearly felt the loss.

**D.     *Rehabilitation***

Post-arrest rehabilitation is an important consideration in sentencing under 18 USC § 3553, and can be a basis for variance from the Guidelines.  See Pepper v. United States, 562 U.S. 476, 504-5 (2011)(under the factors of 18 USC § 3553, post-conviction rehabilitation may support

a downward variance from the Sentencing Guidelines range). In Pepper, supra, the defendant received a downward variance from the U.S. Sentencing Guidelines at his resentencing, due to his extensive rehabilitation efforts after his original sentence. The U.S. Supreme Court stated that post-conviction rehabilitation may be a basis for downward departure, based on its analysis of the sentencing factors under section 3553. The Court stated that a defendant's rehabilitation can be an important factor in sentencing under section 3553 in a number of ways: For example, evidence of rehabilitation:

> "...may also be pertinent to "the need for the sentence imposed" to serve the general purposes of sentencing set forth in § 3553(a)(2) --in particular, to "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training . . . or other correctional treatment in the most effective manner." §§ 3553(a)(2)(B)-(D); see McMannus, 496 F.3d, at 853 (Melloy, J., concurring) ("In assessing . . . deterrence, protection of the public, and rehabilitation, 18 U.S.C. § 3553(a)(2)(B)(C) & (D), there would seem to be no better evidence than a defendant's post-incarceration conduct"). Postsentencing rehabilitation may also critically inform a sentencing judge's overarching duty under § 3553(a) to "impose a sentence sufficient, but not greater than necessary" to comply with the sentencing purposes set forth in § 3553(a)(2)."
>
> Pepper, supra, at 491.

Since his January arrest in this case, Mr. Schmidt has done everything possible to resolve his case, rehabilitate himself, and help other inmates. Mr. Schmidt's post-arrest rehabilitation efforts qualify for a variance here. Mr. Schmidt has not sat idly during incarceration - he has actually used his time to help others. Undersigned counsel has verified with Mr. Schmidt's classification counselor at the Alexandria Detention Center that Mr. Schmidt has been a unit worker for 4-5 months. (This includes keeping the unit clean and serving meals.) She described him as a "model inmate" who helps other inmates with their emotional turmoil during incarceration, as well as their cases. She stated, "I wish all inmates were like him."

Mr. Schmidt lived a law abiding life while in Great Britain. Two persons who employed him, knew him well, and are aware of his charges have written letters of support for him. (A third

employer who was referenced in the presentence report is apparently presently in Australia. Counsel has been unable to reach him as of the filing of this memorandum.)

The first reference, Mr. Hammond, has known Mr. Schmidt since late 2014. Exhibit A. Mr. Hammond has a decorating business, and described Mr. Schmidt as "extremely diligent and hard-working." Mr. Hammond further stated, "As a landlord I would describe him as a perfect tenant." Mr. Hammond was in a position to evaluate Mr. Schmidt over the course of a number of years, and saw the person who Mr. Schmidt can be when he is released from prison. This is consistent with Mr. Schmidt's behavior at the Alexandria Detention Center.

Mr. Schmidt's second reference, Mr. Toft, has also known Mr. Schmidt for years.[1] Exhibit B. Mr. Schmidt helped Mr. Toft set up his business. Significantly, Mr. Toft also knew other persons who worked with Mr. Schmidt, and knew Mr. Schmidt socially. Mr. Toft, having both business and social interactions with Mr. Schmidt over the course of years, also speaks in accolades about Mr. Schmidt.

These references in Great Britain are consistent with Mr. Schmidt's rehabilitation efforts at the Alexandria Detention Center. And they are consistent with his guilty plea in this case.

Mr. Schmidt has also written a letter to the Court. Exhibit C. (Exhibit C-1 is Mr. Schmidt's letter in typewritten form for ease of reading. Exhibits C-2 and C-3 are his original letter in his own handwriting.) While he clearly panicked in leaving the U.S., he did not use an alias in Great Britain, did not oppose extradition, and has behaved in both in Great Britain and his return to the U.S. in a manner showing genuine efforts to end the cycle of overreaching in his life.[2] This acknowledgment and his efforts at rehabilitation are unusual, and bode well for his ability to be

---

[1] Mr. Toft made an error in his reference to the year 2013, rather than 2014, when Mr. Schmidt moved to Great Bridtain.

[2] During the plea hearing, the Court inquired as to the language in the plea agreement at ECF 14, p. 3: "However, the parties are free to argue for a Criminal History Category different from that estimated above in subsection B." The parties agree that this is boilerplate language in plea agreements in this jurisdiction, and was not specific to Mr. Schmidt's plea agreement.

a law abiding and productive citizen in the future.

Mr. Schmidt has a substantial restitution requirement. He is clearly capable and wants to fulfill his restitution requirement, but cannot do so while incarcerated. It is in the public interest for him to be in a position in the community to be able to make restitution payments while under supervision of the Court, and which he cannot do while incarcerated.

### E.   *Sentencing Guidelines Range*

The United States Sentencing Guidelines (USSG) range as noted in the presentence report includes a loss of more than $550,000, for a total Guidelines level 22, or 41 to 51 months incarceration. The Guidelines range alone does not take into consideration the factors described in this memorandum which are necessarily considered under 18 USC § 3553, and which compel a lower sentence.

The loss level under the Guidelines is calculated as approximately $746,000. PSR ¶ 38. But the actual loss to the bank was far less - $106,775. (As of the filing of this memorandum the final PSR has not been submitted. Draft PSR ¶ 133 lists the actual loss as $110,000, but the government subsequently proffered to the Probation Office that $106,775 is the correct amount. The defense concurs.)

If the actual loss of approximately $106,775, which is the amount the bank actually lost from Mr. Schmidt's actions, were considered, rather than the Guidelines described "intended loss," Mr. Schmidt's total Guidelines range would be level 16, for a Guidelines range of 21-27 months incarceration. (This is because the loss amount would be +8 rather than +14 at PSR ¶ 38, U.S.S.G. § 2B1.1(b)(1)(H).) A sentence reflecting the actual loss to the bank is consistent with the restitution amount. It would allow Mr. Schmidt to begin restitution payments upon release from incarceration and begin to reimburse the bank after two years incarceration.

In other cases involving financial fraud, courts have substantially reduced sentences below the calculated Guidelines, considering the actual financial gain by the defendant and/or loss by the complainant(s). Below are recent cases involving financial fraud.

In United States v. David Correia, Case no. 19-cr-723, SDNY, David Correreia was sentenced in February, 2021, after pleading guilty to defrauding investors of millions of dollars. He was sentenced to one year incarceration, although the government recommended 33-42 months incarceration. In that case, Correia was also required to pay $2.3 million in restitution. The defense emphasized that Correreia's personal gain was less than $50,000. Here, the bank's loss is the same as Mr. Schmidt's gain, which is far less than the Guidelines range. See Shayna Jacobs, Businessman sentenced to prison in fraud case involving ex-Guiliani associate Lev Parnas, Washington Post, Feb 8, 2021, available at https://www.washingtonpost.com /national-security /david-correia-sentenced-prison/2021/02/08/4a4bc1ba-6a28-11eb-9ead-673168d5b874_story .html.

In United States v. Duncan Hunter, case no. 18-cr-3677, SDNY, Duncan Hunter was sentenced in March, 2020, to 11 months incarceration after using more than $150,000 of campaign money for personal spending. As Mr. Hunter's plea agreement and sentencing memoranda are not public, his Guidelines range is not known. (Mr. Hunter was later pardoned by former President Trump.) See Neil Vigdor, Duncan Hunter Sentenced to 11 months in Prison for Stealing Campaign Funds, The New York Times, March 17, 2020, available at https://www.nytimes.com/2020/03/17/us /duncan-hunter-sentencing.html.

In United States v. Christopher Collins, case no. 18-cr-567, SDNY, Christopher Collins received a 26-month sentence in January, 2020, after pleading guilty to insider trading, benefitting his son and other persons more than $700,000. The government recommended a sentence at the top end of the Guidelines range, which was 46 to 57 months. Id., ECF no. 155. (Mr. Collins subsequently received executive clemency.) See Benjamin Weiser and Emily Palmer, Ex-Rep. Chris Collins Gets 26-Month Prison Sentence in Insider Trading Case, The New York Times, Jan. 17, 2020, available at https://www.nytimes.com/2020/01/17/nyregion/chris-collins-sentencing-prison.html.

Mr. Collins' son, Cameron, who benefitted by more than $500,000 from the insider trading, had a Guidelines range of 37 to 46 months incarceration. The Government asked for a sentence

within that range.  Id., ECF no. 163.  Cameron Collins received a sentence of five years probation, including 6 months home confinement.

### F. *The Impact of the Coronavirus Pandemic on Incarceration*

To determine a just punishment for Mr. Schmidt, the Court must consider his conditions of confinement.  Since the beginning of the COVID-19 pandemic, inmates have served time under harsher conditions than pre-pandemic:  movement is limited, visits suspended, and clients have been detained in their cells for a large part of the day. While the Bureau of Prisons has gone through several phases to modify restrictions on inmates, social visits are limited to maintain safety, and "[i]nmate movement in small numbers is authorized for…showers three times each week."[3]  Thousands of BOP inmates have tested positive for COVID-19 ,and the BOP records show that <u>271</u> inmates have died from COVID-19.[4]

The Sentencing Commission's recent data does not accurately acknowledge the impact COVID-19 has had on sentences. Reportedly, federal judges have given downward variances in 2.5% of cases based on COVID-19; however, the Commission data includes cases 6 months before the pandemic, spanning from October 2019 to September 2020.[5]   While the Commission has made no recommendations on adjusting sentences based on the harshness of serving time during the pandemic, many Federal judges have addressed the impact COVID-19 has on those serving a sentence. One Federal judge has explained:

---

[3]  See Fed. Bureau of Prisons, BOP Modified Operations (Updated Nov. 25, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed September 29, 2021).

[4]  See Fed. Bureau of Prisons, COVID-19 Cases, https://www.bop.gov/coronavirus/ (last accessed December 9, 2021).

[5]  Brian Jacobs, The U.S. Sentencing Commission's Inadequate Response To Covid-19, Forbes.com, Sept. 17, 2021,  https://www.forbes.com/sites/insider/2021/09/17/ the-us-sentencing-commissions-inadequate-response-to-covid-19/?sh=64d4dab27ee8

> Most of the time has been in lockdown conditions 23 hours a day, basically like solitary confinement with no access to visitors for most of that time, virtually limited programming. And **I do believe that because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served. So I think having served 24 months is equivalent to having served three years**. That's what I believe in terms of how punitive it's been and how harsh it's been.
> Sentencing Tr. at 17-18, <u>United States v. Gonzalez</u>, Case No. 1:18-cr-00669-JPO, ECF No. 250 (S.D.N.Y. April 2, 2021) (emphasis added).

While Mr. Schmidt is vaccinated, with the rise of COVID-19 variants, the risks of contracting the virus and death remain a serious concern for inmates, even for those who have been vaccinated, due to breakthrough infections.[6]

In addition, Mr. Schmidt has spent his U.S. pretrial detention - since December, 2020 - at the Alexandria Detention Center. Mr. Schmidt reports that he spent his incarceration period in the UK in 23-hour lockdown. On arrival in the US, he was originally in complete lockdown quarantine for 2 weeks, then spent approximately 2 months in limited movement - 45 minutes out of cell, three times per week. In May, 2021, the detention facility moved to normal schedule internally, but outside visits, including by counsel, are still very limited. The pandemic conditions are much more punitive and stressful than pre-pandemic jail conditions, and compel consideration in sentencing.[7]

---

[6] <u>See</u> Casey Tolan, Compassionate release became a life-or-death lottery for thousands of federal inmates during the pandemic, Cnn.com, Updated 7:05 am, Sept. 30, 2021, https://www.cnn.com/2021/09/30/us/covid-prison-inmates-compassionate-release-invs/index.html ("In at least one recent case, an inmate died after contracting a breakthrough coronavirus case despite being vaccinated. Rasheem Hicks, 42, who was serving a six and a half-year sentence for cocaine and firearm possession, died late last month about two weeks after testing positive for Covid-19.")

[7] Mr. Schmidt was arrested on September 29, 2020, in the U.K., and has been continuously detained for this case since that time. To ensure that Mr. Schmidt receives credit for incarceration for this case, including incarceration in the U.K. while awaiting extradition, the defense requests that Mr. Schmidt receive his sentence "with credit from the date of arrest of September 29, 2020" so that Bureau of Prisons (BOP) does not overlook his incarceration in the U.K.

Counsel was initially able to visit Mr. Schmidt with pre-scheduled appointments - if fully dressed in gloves, N-95 mask, and a face shield. But the Detention Center later changed its policy to disallow face-to-face (actually mask-to-mask) visits with attorneys. Only appointments for visits via glass wall were allowed. To date, an appointment still must be scheduled in advance, and counsel has not been allowed a face-to-face visit. Lack of in-person communication has a detrimental impact on both case discovery and attorney client communications.

### G.   *Just Punishment*

Mr. Schmidt requests 2 years (24 months) incarceration, with 2-5 years supervised release, contingent on full payment of restitution.   Mr. Schmidt plans to relocate to Nevada on release, due to health issues and job opportunities. While there are no Federal prisons in Nevada, halfway houses are available. He requests that the Court recommend placement in Arizona or southern California, so that he has more accessibility to halfway house placement in Nevada. Of course, while on supervised release Mr. Schmidt would be supervised by the U.S. Probation Office, to ensure his compliance with all conditions of release.

This sentence would punish Mr. Schmidt for his actual financial loss to the bank, while also recognizing Mr. Schmidt's rehabilitation and requirement to pay restitution. This is well within the range of comparative sentencing incarceration for other financial fraud cases, detailed above.

### III.  *Conclusion*

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Gall v. United States, 552 U.S. 38,52 (2007) citing Koon v. United States, 518 U.S. 81, 113 (1996).

Given Mr. Schmidt's early and complete acceptance of responsibility, clear potential for rehabilitation and restitution payments, increased punitive impact of incarceration during the pandemic, and public benefit in restitution payments in the community, a sentence below the U.S.S.G. Gudielines level, of 24 months incarceration, is indicated in this case to protect the public, afford just punishment, and provide for rehabilitation and restitution.

Respectfully submitted,

_____/s/_____

Joanne D. Slaight, #332866
400  7th Street, N.W.,  Suite 206
Washington, DC  20004
Phone (202) 256-8969
Email:   jslaight@att.net